UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONNA LaFEVER,

                    Plaintiff,

          -v-                              3:17-CV-1206

BRANDON CLARKE, DANIEL
J. SHEEHAN, ERNEST R.
CUTTING, JR., ED WHITE,
CRAIG HACKETT, TRACY
ROTUNDO, and ALLEESHA
SHOPA,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

W. ANDREW MCCULLOUGH,                WILLIAM A.
    ATTORNEY AT LAW                      MCCULLOUGH, ESQ.
Attorneys for Plaintiff
6885 South State Street, Suite 200
Midvale, UT 84047


JOHNSON LAWS, LLC                   GREGG T. JOHNSON, ESQ.
Attorneys for Defendants Brandon    APRIL J. LAWS, ESQ.
    Clarke and Daniel J. Sheehan    COREY A. RUGGIERO, ESQ.
646 Plank Road, Suite 205           LORAINE CLARE JELINEK, ESQ.
Clifton Park, NY 12065

OFFICE OF FRANK W. MILLER                FRANK W. MILLER, ESQ.
Attorneys for Defendants Brandon         CHARLES C. SPAGNOLI, ESQ.
    Clarke, Daniel J. Sheehan, Ernest
    R. Cutting, Jr., Ed White, Craig
    Hackett, Tracy Rotundo, and
    Alleesha Shopa
6575 Kirkville Road
East Syracuse, NY 13057

DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 4

II. BACKGROUND ................................................................ 7

    A. Arrest at the Hotel ...................................................... 7

    B. Booking at the Police Station ....................................... 9

    C. Intake at the County Jail ............................................ 12

III. LEGAL STANDARDS ..................................................... 13

    A. Summary Judgment .................................................. 13

    B. Qualified Immunity .................................................. 14

IV. DISCUSSION ................................................................ 16

    A. Threshold Matters .................................................... 17

    1. The City Defendants' Statement of Facts ........................ 17

        2. The County Defendants' Statement of Facts ................... 21

            i. Paragraph Nine ................................................ 21

            ii. Paragraphs Twelve Through Sixteen ...................... 24

            iii. Paragraphs Eighteen and Nineteen ....................... 31

        3. LaFever's Declarations .......................................... 34

        4. The Video Evidence .............................................. 35

    B. The Merits .............................................................. 37

        1. The City Defendants .............................................. 37

            i. False Arrest ...................................................... 40

            ii. Excessive Force ................................................ 44

         2. The County Defendants ......................................... 50

            i. Remaining Claims ............................................. 51

                a. The Jail Intake Video ..................................... 51

                b. The Decontamination Shower ........................... 57

                c. The Strip Search .......................................... 60

                d. Municipal Liability ...................................... 61

        3. The Remaining Doe .............................................. 64

V. CONCLUSION ................................................................ 64

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On October 31, 2017, plaintiff Donna LaFever ("LaFever" or "plaintiff") filed this 42 U.S.C. § 1983 action against defendants City of Norwich, New York ("Norwich" or the "City"), Norwich Police Chief Rodney V. Marsh ("Chief Marsh"), Norwich Police Officer Brandon Clarke ("City Officer Clarke"), Norwich Police Officer Daniel Sheehan ("City Officer Sheehan"), and a group of John and Jane Does (the "Does") employed by the Chenango County (the "County") Sheriff's Office at the County Jail (the "County Jail" or the "Jail").

LaFever's complaint alleged that City Officer Clarke and City Officer Sheehan used excessive force while falsely arresting her at the Howard Johnson's Hotel in Norwich, New York.  Dkt. No. 1.  The complaint further alleged that the Does used excessive force when they took custody of her at the County Jail.  *Id*.

On December 6, 2017, LaFever amended her complaint to add County Sheriff Ernest R. Cutting, Jr. ("Sheriff Cutting") as a named defendant.  Dkt. No. 5.  Thereafter, plaintiff amended her complaint to identify four of the Does: County Jail Corrections Officers Craig Hackett ("County Officer Hackett"), Tracy Rotundo ("County Officer Rotundo"), Ed White ("County Officer White"), and Alleesha Shopa ("County Officer Shopa").  Second Am. Compl., Dkt. No. 34.  A single Doe defendant remained unidentified.  *Id*.

LaFever's nine-count second amended complaint asserts § 1983 claims against City Officers Clarke and Sheehan for false arrest and imprisonment (Second Cause of Action), unreasonable search and seizure (Third Cause of Action), and excessive force (Fifth Cause of Action).  The second amended complaint also asserts § 1983 claims against County Officers Hackett, Rotundo, White, Shopa, and the Doe for false arrest and imprisonment (Second Cause of Action), excessive force (Fourth Cause of Action), and a violation of her rights to due process and equal protection (Seventh Cause of Action).  Finally, the second amended complaint asserts § 1983 municipal liability claims against the City and the County (Eighth Cause of Action).[1]

On May 3, 2019, LaFever moved for partial summary judgment under Federal Rule of Civil Procedure ("Rule") 56.  Dkt. No. 71.[2]  According to plaintiff, surveillance video from the receiving area of the County Jail establishes that the conduct of County Officers Hackett, Rotundo, White, Shopa, and the Doe amounts to excessive force as a matter of law.  Dkt. No.

---

[1]  In her First Cause of Action, LaFever improperly asserts a freestanding claim for relief under 42 U.S.C. § 1983.  Second Am. Compl. ¶¶ 55-62.  Plaintiff also skips a Sixth Cause of Action entirely; instead, she labels two sequential causes of action as her "Eighth."  *Compare id.* ¶¶ 112-15 (Eighth Cause of Action), *with id.* ¶¶ 116-20 (Eighth Cause of Action).  The second of these "eighth" causes of action is just asking for damages and is better understood as part of the operative pleading's *ad damnum* clause.

[2]  LaFever initially filed this motion on February 6, 2019, Dkt. No. 57, but it was denied without prejudice to renew because she had failed to comply with the Local Rules governing dispositive motion practice in this District, Dkt. No. 70.

71-4.  Plaintiff further argues that she is entitled to summary judgment on her municipal liability claim against the County.  *Id.*

On June 28, 2019, the City, Chief Marsh, City Officer Clarke, and City Officer Sheehan (collectively the "City defendants") moved for summary judgment on all of the claims LaFever asserted against them.  Dkt. No. 79. According to the City defendants, other video evidence and testimony from the hotel's manager conclusively establishes that both officers acted reasonably in arresting plaintiff after she pushed and shoved them and refused to leave the hotel.  Dkt. No. 79-14.

On June 30, 2019, Sheriff Cutting and County Officers Hackett, Rotundo, White, and Shopa (collectively the "County defendants") also moved for summary judgment on all of the claims LaFever asserted against them.  Dkt. No. 80.  According to the County defendants, they acted reasonably in using a modest degree of force on her at the County Jail because she was physically resistant and ignored commands to drop an unknown object.  Dkt. No. 80-16.

On August 20, 2019, LaFever stipulated to the discontinuance of her claims against the City and Chief Marsh.  Dkt. No. 87.  The remaining matters have been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__

LaFever is a California resident who, during the time period relevant here, was engaged to Ronald Busbee ("Busbee").  Second Am. Compl. ¶¶ 1, 10.  Plaintiff and her fiancé had come to New York to visit relatives in Chenango County.  *See* County Defs.' Rule 7.1(a)(3) Statement ("County Facts"), Dkt. No. 80-2 ¶ 1.  They stayed in Room 204 at the Howard Johnson's Hotel, which is located at 75 North Broad Street in Norwich.  City Defs.' Rule 7.1(a)(3) Statement ("City Facts"), Dkt. No. 79-15 ¶¶ 2–3.

On November 30, 2015, LaFever and her fiancé were scheduled to check out of the hotel room.  City Facts ¶ 3.  They had not booked another night.  *Id.* ¶ 4.  For some reason, though, plaintiff called hotel manager Katherine Babcock ("Babcock") and told her that she refused to leave the hotel room.[3]  *Id.* ¶¶ 1, 6–7.  The conversation got heated, plaintiff continued to refuse to vacate the room, and eventually she told Babcock to "call the cops."  *Id.* ¶¶ 7–9.

### A. __Arrest at the Hotel__

Hotel management called LaFever's bluff.  They telephoned the Norwich Police Department ("Norwich PD") and requested assistance with "a guest

---

[3] According to plaintiff, this was the hotel's mistake—they'd double-booked the room.  LaFever County Dep., Ex. B to White Aff., Dkt. No. 80-10 at 61:3–61:13.  Plaintiff testified that Babcock offered to move her to a different room in the hotel, but plaintiff refused because her room had "a jacuzzi" and other "amenities that we wanted."  *Id.* at 64:16–64:23.

refusing to vacate the hotel room after her scheduled stay had expired."  City Facts ¶¶ 10–12.  City Officer Clarke and City Officer Sheehan responded to the hotel's call for help.  *Id.* ¶ 13.  The two officers showed up in uniform and a marked Norwich PD police cruiser.  *Id.* ¶¶ 14–15.

Babcock led the officers to LaFever's hotel room.  City Facts ¶ 16.  City Officer Clarke knocked on the door and requested identification from plaintiff.  *Id.* ¶¶ 17–18.  Plaintiff refused to provide any; instead, she shut the door on City Officer Clarke.  *Id.* ¶¶ 21–22.  Plaintiff then began arguing with the officers through the hotel room door, telling them that her refusal to leave the hotel was "none of your business."  *Id.* ¶¶ 23–24.

After some back and forth, LaFever opened the door to the hotel room and, ignoring the officers, began talking directly to Babcock in a "raised" voice.  City Facts ¶¶ 25–26.  City Officer Clarke gave plaintiff "multiple orders" to vacate the room.  *Id.* ¶ 27.  Plaintiff ignored him.  *Id.* ¶ 28.

LaFever soon turned her attention away from Babcock and toward City Officer Clarke, addressing him in an "aggressive manner."  City Facts ¶ 30.  With the two officers still standing in the doorway to the hotel room, plaintiff tried multiple times to push past them.  *Id.* ¶¶ 31–35.  On her second attempt, plaintiff shoved City Officer Clarke on his right side.  *Id.* ¶¶ 36–37.

 The two officers decided to arrest LaFever for harassment based on the physical contact she had made with City Officer Clarke.  City Facts ¶ 38.

They told plaintiff she was under arrest.  *Id*. ¶ 38.  Then they tried to put her in handcuffs.  *Id*. ¶ 39.  Plaintiff resisted.  *Id*. ¶¶ 40–41.  She punched and kicked City Officer Clarke.  *Id*. ¶¶ 42–43, 46–47.  She also thrashed her body around and flailed her arms and legs.  *Id*. ¶¶ 44–45.  Both officers directed her to calm down, but she continued to resist.  *Id*. ¶¶ 48–54.  Plaintiff screamed obscenities and made statements that both officers perceived as threatening.  *Id*. ¶¶ 55–57.

Eventually, the two officers managed to place LaFever in handcuffs.  City Facts ¶¶ 58.  But she continued to resist as they tried to escort her to the police cruiser.  *Id*. ¶ 58.  Plaintiff refused to walk, leaned her body against the police car, and tried to prevent City Officer Clarke from putting her in the backseat of the vehicle.  *Id*. ¶¶ 59–62.  Babcock, the hotel manager, witnessed these events, *id*. ¶¶ 63–64, but Busbee, plaintiff's fiancé, did not arrive until after the incident had ended, *id*. ¶¶ 65–66.

## B. <u>Booking at the Police Station</u>

After they got her into the police car, City Officers Clarke and Sheehan transported LaFever to the Norwich police station so they could complete some paperwork about the arrest.  *See* City Facts ¶¶ 71–72, 77.  Plaintiff made "alarming" and "threatening" statements to the officers during this trip.  *Id*. ¶¶ 71–74.  Surveillance camera footage offered by the City defendants shows that plaintiff was taken inside the police station and

handcuffed to a chair in an open booking area.  Ex. A to Jelinek Decl., Dkt. No. 79-1 ("Police Station Booking Video" or the "Booking Video") (conventionally filed with the Court).

LaFever did not have any obvious injuries as a result of her arrest.  City Facts ¶¶ 75–76; *see also* Police Station Booking Video.  And plaintiff never requested medical attention or claimed that she was injured while she was in Norwich PD's custody.  City Facts ¶¶ 114–15.  However, the Booking Video does show plaintiff acting in an agitated manner.  *Id*. ¶¶ 80–98; *see generally* Police Station Booking Video.

For instance, the footage shows LaFever almost immediately begin arguing with the duty officer, launching into an extended recitation of her version of events and an explanation of why she is innocent.  Police Station Booking Video at 12:26:45–12:27:10, 12:28:13–12:38:40.[4]  At one point, plaintiff stands on the chair and performs some kind of extended stretching exercise.  *Id*. at 12:27:49–12:28:08.

After an officer adjusts LaFever's handcuffs, she calms down and begins answering questions about her pedigree information.  *See* Police Station Booking Video at 12:38:40.  Importantly, though, plaintiff refuses the officer's request to hand over a small crystal necklace because she does "witchcraft"

---

[4]  The Booking Video has a hardcoded timestamp that differs from the runtime of the media file itself.  The specific timestamp citations found in this opinion are to the former.

and believed "demons [would] come" if she gave it up.  City Facts ¶ 99.

However, plaintiff did not tell anyone that it was a religious symbol or

discuss her religious affiliation with the officers.  *Id.* ¶¶ 101–02.

When the duty officer leaves the booking area, the Police Station Booking

Video shows LaFever slip out of her handcuffs and begin doing handstands

against the wall.  *See, e.g.*, Booking Video at 12:50:45.  She also does a split

and performs some yoga moves.  *Id.* at 12:51:25.  She eventually tries to leave

the booking area, but finds the door is locked.  *Id.* at 12:51:50.  Unable to

leave, she writes some messages on the dry-erase whiteboard hanging on the

wall.[5]  *Id.* at 12:53:02.  Finally, two officers return and handcuff plaintiff

more securely to a nearby chair.  *Id.* at 12:56:49–12:57:07.

LaFever's detention at the Norwich police station lasted about an

hour.  *See generally* Police Station Booking Video.  The officers charged

plaintiff with second-degree harassment for making physical contact with

City Officer Clarke.  City Facts ¶ 105.  Thereafter, the officers left the

booking area with plaintiff and transported her to an arraignment proceeding

before Norwich City Judge James E. Downey.  *Id.* ¶ 106.  Plaintiff continued

to be uncooperative and physically combative.  *Id.* ¶ 103.  Judge Downey

remanded plaintiff to the County Jail.  *Id.* ¶ 107.  Plaintiff's "defiant and

---

[5]  The City defendants have included as an exhibit a picture of the text on the whiteboard, which reads as "the officer will c me in his dream . .".  Ex. G to Jelinek Decl., Dkt. No. 79-9.

combative behavior continued" as City Officer Sheehan transported her to the Jail in his police cruiser.  *Id*. ¶¶ 108–09.

## C. <u>Intake at the County Jail</u>

Norwich PD had phoned ahead to County Officer Hackett to warn him that LaFever "was being uncooperative and that she had an unknown object in her hand."  County Facts ¶ 9.  Upon arrival, County Officers Hackett, Rotundo, White, and Shopa forcefully removed plaintiff from the vehicle.  County Facts ¶ 13; Ex. 2 to Pl.'s Mot. for Summ. J., Dkt. No. 71-6 ("Jail Intake Video") (conventionally filed with the Court).

LaFever tried to pull away from the County Officers and refused commands to drop the object in her hands.  County Facts ¶ 13.  The County Officers took plaintiff down to the ground.  *Id*. ¶ 13.  Because she continued to refuse their commands, County Officer Hackett "applied a one second burst of chemical agent to [plaintiff's] head area."  *Id*. ¶ 14.  Plaintiff finally dropped the object, which turned out to be the crystal necklace that she had refused to give up at the Norwich police station.  *Id*.

Thereafter, County Officers Shopa and Rotundo escorted LaFever inside the Jail and searched her for contraband.  County Facts ¶ 17.  They took plaintiff to the shower area for "decontamination from exposure to the chemical agent."  *Id*. ¶ 18.  Plaintiff was also strip-searched.  *Id*. ¶ 20.

Finally, LaFever was taken to a holding cell, where she was seen by Nurse Locke.  County Facts ¶ 22.  Plaintiff had no apparent injuries and did not report any injuries or medical problems to Nurse Locke.  *Id*. ¶ 23.  Plaintiff was eventually released on bail.  *Id*. ¶ 24.  She later pleaded guilty to second-degree harassment.  City Facts ¶ 110.

## III.  LEGAL STANDARDS

### A.  Summary Judgment

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## B. **Qualified Immunity**

The doctrine of qualified immunity shields defendants from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Under the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), to defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2) that was "clearly established" at the time of the challenged conduct. *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

As the Third Circuit has explained, "the most helpful approach is to consider the constitutional question as being whether the officer made a reasonable mistake of fact, while the qualified immunity question is whether the officer was reasonably mistaken about the state of the law." *Curley v. Klem*, 499 F.3d 199, 214 (3d Cir. 2007).

Importantly, though, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that the lower courts can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236.  In other words, since *Pearson* was decided "lower courts

have had the option to proceed directly to step two of the analysis and, if they find that qualified immunity applies, avoid the unnecessary litigation of constitutional issues at step one." *Francis*, 942 F.3d at 237 (cleaned up).

At this second step, "[a] right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (cleaned up).

To be clearly established, the rule must be "settled law," which means it is dictated by a "controlling authority" or a "robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589 (cleaned up). This "clearly established" standard also requires the settled law to be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

*Saucier*'s step two inquiry has proven challenging in practice. *See, e.g.*, *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) ("The second question—whether the officer violated clearly established law—is a doozy."); *Stephenson v. Doe*, 332 F.3d 68, 80 n.15 (2d Cir. 2003) ("Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct.").

To help sharpen the analysis, courts often break the second prong down into a pair of separate considerations: (a) whether the defendant's action

violated clearly established law and, even if it did, (b) whether it was objectively reasonable for the defendant to believe that his action was nevertheless lawful at the time. *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015); *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010) (framing the latter component of this inquiry as "whether a reasonable official would reasonably believe his conduct did not violate a clearly established right").

Put differently, "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," the officer is still entitled to qualified immunity. *Dancy*, 843 F.3d at 106 (cleaned up); *see also Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008) ("[E]ven if a constitutional right is clearly established, the defendant is entitled to qualified immunity so long as a reasonable official in [the defendant's] position could believe, albeit mistakenly, that his conduct did not violate the [law].").

## IV.  **DISCUSSION**

There are three motions pending: (1) the City defendants' motion for summary judgment; (2) the County defendants' motion for summary judgment; and (3) LaFever's motion for partial summary judgment.

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking

care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up).  "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id*.

## A.  Threshold Matters

As is too often the case with summary judgment briefing, there is some housekeeping to do before reaching the merits.

### 1.  The City Defendants' Statement of Facts

To begin with, the properly supported material facts set forth in the City defendants' Local Rule 7.1(a)(3) Statement will be deemed admitted for the purpose of assessing whether the City defendants' motion for summary judgment should be granted or denied.  Dkt. No. 79-15.

This is so because LaFever's counsel has failed to properly dispute the facts asserted in this document.  *See generally* Dkt. No. 89.  Under the Local Rules, the party opposing summary judgment is obligated to file a response to the movant's Statement of Material Facts.  N.D.N.Y. L.R. 7.1(a)(3) (2020

ed.) ("The opposing party shall file a response to the Statement of Material Facts.").[6]

This is not just a *pro forma* requirement. *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019) ("The responding Statement of Material Facts is not a mere formality."). "To the contrary, this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *Id*. (cleaned up).

A proper response to a movant's statement of material facts streamlines the summary judgment analysis "by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves." *Alke v. Adams*, 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018), *aff'd*, 826 F. App'x 4 (2d Cir. 2020) (summary order). To that end, the non-movant's response must do three important things:

> It must (1) "mirror the movant's Statement of Material Facts" by (2) "admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs" with (3) "a specific citation to the record where the factual issue arises."

---

[6] The 2020 version of the Local Rules were in effect at the time these motions were filed. Effective January 1, 2021, Local Rule 7.1(a)(3) was restyled as Local Rule 56.1. The substance of the Rule is mostly unchanged. As relevant here, however, the Rule has been amended to make the consequences imposed in the event of a procedural deficiency a discretionary question for the Court to decide. *Compare* Local Rule 7.1(a)(3) (2020 ed.) ("The Court shall deem admitted . . . ."), *with* Local Rule 56.1(b) (2021 ed.) ("The Court may deem admitted . . . .").

*Crawley v. City of Syracuse*, –F. Supp. 3d–, 2020 WL 6153610, at *5 (N.D.N.Y. Oct. 21, 2020) (quoting N.D.N.Y. L.R. 7.1(a)(3) (2020 ed.)).

LaFever did not comply with this Local Rule.[7]  In fact, plaintiff did not file any responsive statement whatsoever to the City defendants' Statement of Material Facts.  *See generally* Dkt. No. 89.  Plaintiff's failure is particularly galling for three reasons.

First, LaFever was previously warned about the need to comply with the Local Rules governing dispositive motion practice in this District.  As mentioned *supra* in footnote two, plaintiff's motion for partial summary judgment was initially denied without prejudice to renew because, as the Court's text order explained, plaintiff had "failed to comply with Local Rule 7.1(a)."  Dkt. No. 70.  In short, plaintiff was on notice of the relevant Local Rule.

Second, LaFever's counsel has demonstrated a workable understanding of this exact procedural requirement.  In her opposition to the County defendants' *separate* motion for summary judgment, plaintiff actually submitted a partially responsive statement of material facts "pursuant to

---

[7]  For some reason, litigants routinely fail to get this right.  *See, e.g., Crawley*, 2020 WL 6153610, at *5 (deeming certain of movant's facts admitted where non-movant failed to comply with the Local Rule); *Frantti*, 414 F. Supp. 3d at 285 (same); *Carter v. Broome County*, 394 F. Supp. 3d 228, 238-39 (N.D.N.Y. 2019) (faulting both parties for injecting unnecessary confusion into the briefing); *Alke*, 2018 WL 5297809, at *1–*3 (admonishing non-movant for failing to include responsive statement of material facts).

Local Rule 7.1." Dkt. No. 90-2. That filing has shortcomings that will be discussed *infra*, but it is a better approach than not filing a response at all.

Third, the City defendants pointed out LaFever's lack of a proper responsive statement of material facts in their reply memorandum. City Defs.' Reply, Dkt. No. 98-2 at 6-9.[8] So even if plaintiff's error started out as an innocent oversight, it is one that has been left uncorrected by a belated filing or even a supplemental request.

There is really no excuse for this mistake. "[T]he requirement that a non-movant submit a responsive statement of material facts in connection with its opposition to summary judgment is not the sort of newfangled procedural requirement that might reasonably be expected to trip up an unsuspecting-but-well-intentioned litigant." *Alke*, 2018 WL 5297809, at *2. "Just the opposite, in fact: the party-driven procedure for identifying factual disputes that is set forth in Local Rule 7.1(a)(3) mirrors the practice adopted by every single federal judicial district in the Second Circuit." *Id.* (collecting citations to local rules).[9]

Thus, for these three reasons, the properly supported facts set forth in the City defendants' Local Rule 7.1(a)(3) Statement shall be deemed admitted for

---

[8] Pagination corresponds to CM/ECF.

[9] The address of record for LaFever's counsel is in Utah. The District of Utah has its own version of this procedural requirement. *See* DUCivR 56-1(c)(3).

the purpose of assessing the City defendants' motion for summary judgment.  *See* FED. R. CIV. P. 56(e)(2) (permitting the court to consider improperly supported or inadequately addressed facts as undisputed for the purpose of summary judgment).

### 2. **The County Defendants' Statement of Facts**

As noted, LaFever did file a response to the County defendants' separate Local Rule 7.1(a)(3) Statement.  Dkt. No. 90-2.  This filing is at least nominally in accordance with the relevant Local Rule.  *Id*.  But there are a few aspects of this responsive filing that have made a proper summary judgment analysis more challenging than it needs to be.

### i. **Paragraph Nine**

The first is a problem with LaFever's response to paragraph nine of the County defendants' Statement of Material Facts, which asserts that:

> 9. Defendant Hackett was told by Officer Burdick of the Norwich P.D. that Plaintiff was being uncooperative and that she had an unknown object in her hand. (Def. Hackett Resp. Interrog. ¶5; Aff. of Def. Hackett in Supp. ¶7).

County Facts ¶ 9.  Plaintiff's response is as follows:

> 9. That statement is hearsay and inadmissible. Plaintiff has no idea what Officer Burdick told anyone.

Pl.'s Response to County Facts, Dkt. No. 90-2 ¶ 9.

This response does not conform to Local Rule 7.1(a)(3).  First, it does not include an admission or a denial.  *Id*.  Second, there is no citation to the record that might establish a factual dispute.  *See, e.g.*, *Davis v. City of Syracuse*, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("[D]enials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").  Third, this is not the proper place to raise an evidentiary objection.  *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 383 (S.D.N.Y. 2009) ("The law is clear that 'blanket denials,' wholesale evidentiary objections, and counterstatements unsupported by any citations are insufficient to create genuine issues of material facts.").

These failures might not matter if LaFever's response to paragraph nine happened to be correct on the law.  FED. R. CIV. P. 56(c)(2); *see also Soto v. City of N.Y.*, 132 F. Supp. 3d 434, ("[H]earsay evidence may not be used to support a motion for summary judgment . . . .").  But they matter in this instance because the County defendants have offered the fact found in paragraph nine for a permissible, non-hearsay purpose.

LaFever's excessive force claim against the County Officers is based in part on her forceful removal from City Officer Sheehan's police cruiser when she arrived at the County Jail.  *See, e.g.*, Pl.'s Response to County Facts ¶ 11

("Plaintiff was met at the intake area by the several Defendants and pounced upon without ANY discussion of ANYthing." (emphases in original)).

A § 1983 excessive force claim requires a pretrial detainee to show that the officers' use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (explaining that a pretrial detainee's excessive force claim is measured by roughly the same objective standard of reasonableness).

This is a fact-specific inquiry guided by considerations that include "the severity of the security problem at issue," "the threat reasonably perceived by the officer," and "whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. To that end, information received by the County defendants from another law enforcement official tending to suggest that LaFever was still being physically combative and/or was in possession of an unknown object would necessarily inform the reasonableness of their response to plaintiff's arrival at the County Jail.

In short, LaFever has not placed the assertion of fact found in paragraph nine in genuine dispute. Accordingly, paragraph nine will be deemed admitted for the purpose of evaluating the County defendants' motion for summary judgment.

### ii. **Paragraphs Twelve Through Sixteen**

The other glaring problem is found in LaFever's response to paragraphs twelve through sixteen of the County defendants' Statement of Material Facts.  There, defendants offer their description of what happened when the County Officers removed plaintiff from Officer Sheehan's vehicle.  According to the County defendants, plaintiff (1) refused their verbal commands to drop the object in her hands, (2) was taken to the ground, (3) continued to refuse to comply, and was eventually (4) sprayed with a short burst of pepper spray or mace, which (5) caused her to drop the object.  County Facts ¶¶ 12–16.

In response, LaFever begins with a rambling complaint about the County defendants' alleged failure to fulfill their discovery obligations in connection with the Jail Intake Video.  Pl.'s Response to County Facts ¶ 12.  It should go without saying, but there are judicial mechanisms in place that allow litigants to air that kind of discovery dispute prior to dispositive motion practice.  Plaintiff did not pursue those mechanisms, and the time in which to do so has long passed.[10]

LaFever's response also fails to state whether she admits or denies the specific facts offered by the County defendants in these paragraphs.  *See* Pl.'s Response to County Facts ¶¶ 12–16.  Requiring a party to admit or deny each

---

[10]  For reasons discussed *infra*, the Court will independently consider the video evidence offered by plaintiff.

fact offered by a movant is not an onerous procedural requirement. Plaintiff's

counsel has demonstrated an understanding of this requirement elsewhere in

his response. *See, e.g.*, *id*. ¶ 8 (admitting); *id*. ¶ 10 (denying). Counsel's

failure to do so with respect to these important factual assertions is baffling.

Most importantly, LaFever's response to these paragraphs is just her own

narrative opinion about the Jail Intake Video. *Id*. ¶ 12. For example,

plaintiff states:

> 27. At 15:07:54, one of the female officers opens the
> door and reaches inside. The other officers crowd
> around.
>
> 28. At 15:07:55, the female officer violently pulls me
> from the car. At least two other officers immediately
> join in holding onto me. At 15:08:05, I am dragged
> from the vehicle and put on the ground by four officers.
> I clearly am still handcuffed and offering no
> resistance. I am held on the ground until 15:08:11 and
> sprayed with chemical "mace".
>
> 29. At 15:08:28, I am dragged through the jail door by
> three officers, and it closes behind me. The total time
> elapsed from my first contact with the female officer to
> the time the door closes behind me is 33 seconds.

Pl.'s Response to County Facts ¶ 12.

In LaFever's view, these block quotations "largely show[ ] that

[defendants'] statements are without basis in fact." Pl.'s Response to County

Facts ¶ 12. Plaintiff instructs the reader to refer to this same block quotation

in paragraphs thirteen through seventeen. *Id*. ¶¶ 13–17.

Upon review, this response does not properly controvert the County defendants' factual assertions about what happened in the receiving area outside the County Jail. At best, this response establishes that LaFever believes that the Jail Intake Video shows she was "offering no resistance." But the Court is fully capable of viewing the video for itself and can draw its own conclusions about whether or not the surveillance footage establishes any relevant facts for the purpose of summary judgment.

Indeed, the Supreme Court has instructed lower courts to do just that. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

LaFever's opinion about what the Jail Intake Video "clearly" shows or does not show is not useful in the summary judgment analysis. And it is not helpful in determining whether the disputes over the facts are genuine or not. After all, plaintiff herself was present for the events depicted in the Jail Intake Video. She was a participant in these events. She is in the best position to admit or deny being "physically resistant" when she was removed from the vehicle. County Facts ¶ 12. She is fully capable of admitting or denying that she "ignored or failed to comply with several commands to drop

what was in her hands." *Id*.  And she knows whether or not she tried "to pull away from the officers" before she was placed on the ground.  *Id*. ¶ 13.

As before, answers to these questions inform the reasonableness of the County Officers' conduct.  *Kingsley*, 576 U.S. at 397.  If, as the County defendants assert, plaintiff was physically resisting and refusing verbal commands to drop the object before she entered the County Jail, some measure of force was permissible as a matter of law.  *Kingsley*, 576 U.S. at 397.  If, however, some or all of those facts are genuinely in dispute—say, if plaintiff denied being given any commands to drop the object and/or denied being physically uncooperative—then a jury trial might be necessary to properly adjudicate this claim.

LaFever's decision to respond by giving her own impression of the Jail Intake Video does not help answer these important questions.  That is especially so where, as here, the viability of her excessive force claim depends in part on whether or not she resisted commands to drop the object.  As is often the case with surveillance footage, the Jail Intake Video does not have any accompanying audio.  So in the absence of any specific denials by plaintiff, the movant's properly supported assertions about what was said or not said are left uncontroverted for purposes of summary judgment.

Why bother picking these nits?  Because Local Rule 7.1(a)(3) exists to save "the reviewing court the trouble of having to do what this Court is doing right

now—double- and triple-checking each individual factual allegation to determine whether it is genuinely in dispute or whether the non-movant just wants it to appear to be in dispute . . . because they think it is damaging to their case." *Crawley*, 2020 WL 6153610, at *6.

A court's responsibility on summary judgment is challenging enough when everyone follows the rules. *Gallo v. Prudential Res. Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (Cardamone, J.) ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.").

When one party fails to live up to their end of the deal, the Court is forced to pick its own way through the briar patch. *See United States v. Dunkel*, 926 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."). A false step might open an avenue for appeal. And that's often true even if the uncertainty or confusion resulted from the litigant's own misconduct.

Experience suggests that this happens when the Court and a litigant are working at cross-purposes. For example, a litigant who knows they will have proof problems at trial might be tempted to muddle the fact record so hopelessly that it frustrates any meaningful summary judgment analysis. If the reviewing court tosses the entire matter over to a trial, the litigant can

declare it a win.  This kind of intermediate procedural victory might give the litigant one more shot at extracting a settlement.

The Court's goal is different.  "The right to trial by jury has long been an important protection in the civil law of this country." *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005).  But the time and attention of jurors should not be squandered for expediency's sake.  In recognition of the judicial responsibility to guard against those abuses, summary judgment has a serious purpose: it is supposed to help the Court decide if a trial would be a waste of time.

Consider the fact pattern of this case.  The County defendants have already offered their version of what happened in the receiving area of the County Jail.  They claim plaintiff was physically combative and refused to drop an object in her hands, so they took her to the ground and gave her a quick burst of pepper spray, which caused her to drop the object.  County Facts ¶¶ 12–16.  The County defendants have offered a valid justification for this use of force: contraband items possessed by a person entering the Jail pose a danger to the safety of the inmates, officers, and staff.[11]  *Id*. ¶ 10.  And once plaintiff complied by releasing her grip on the object, the County defendants assert that the use of force quickly abated.  *See id*. ¶¶ 12–16.

---

[11]  LaFever denies this assertion because, in her view, the object was not a concern to the Norwich PD officers at the police station.  Pl.'s Response to County Facts ¶ 10.  That response does not appropriately controvert this fact.

Those facts, if true, would tend to strongly support the conclusion that the County Officers acted reasonably under the circumstances. *Kingsley*, 576 U.S. at 397 (explaining that objective reasonableness on a pre-trial detainee's § 1983 excessive force claim is assessed by considering, *inter alia*, "any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting").

At trial, the initial burden would be LaFever to offer evidence sufficient for a jury to reach a different conclusion about what happened. The jury would be able to view the Jail Intake Video, but it would have to rely on testimony to establish what was said or not said during the encounter. If plaintiff failed to offer evidence that established a different version of events than the one given by the County defendants in their summary judgment papers, the jury would almost certainly find in the defendants' favor. And even if for some reason the jury did not reach that result, the Court would likely be obligated to vacate the award for a failure of proof.

That is one reason why Local Rule 7.1(a)(3) asks the non-movant to point out portions of the record that, if introduced at a trial and credited by a finder of fact, would support their claim for relief. LaFever has not done this at all. Instead, she has only offered her own opinion about what she thinks the Jail Intake Video shows. Because plaintiff has failed to admit or deny these

assertions of fact or otherwise validly place these matters in dispute, paragraphs twelve through sixteen will be deemed admitted subject to the Court's independent review of the Jail Intake Video.

### iii. __Paragraphs Eighteen and Nineteen__

The final problem with LaFever's response to the County defendants' Statement of Material Facts is located at paragraphs eighteen and nineteen. There, defendants offer their account of what happened once plaintiff was taken inside the County Jail.

Unlike the receiving area outside, there is no surveillance footage of what happened inside the County Jail. According to the County defendants, LaFever was taken to a shower area for "decontamination" because she had been sprayed with the "chemical agent." County Facts ¶ 18. Defendants contend that plaintiff "continued to be both physically and verbally noncompliant" at this time. *Id*. ¶ 19.

LaFever's response to these factual assertions is unnecessarily confusing. First, plaintiff correctly indicates that she "admit[s]" paragraph eighteen. Pl.'s Response to County Facts ¶ 18. In other words, she admits that she was taken to a shower area. For some reason, though, plaintiff then goes on to quote extensively from portions of an affidavit she has filed elsewhere:

30.  Once inside the jail, two female officers further abused me by stripping my clothes off and forcing me to take a freezing cold shower.  Since the court ordered me to be released upon posting bail in the amount of $500, none of these actions were reasonable.

31.  Officers slammed my body against the shower walls several times and down on the shower floor while I remained in handcuffs.

32.  Officers verbally abused me by screaming various commands at me like where to stand and how to use the shampoo.  I was on my hands and knees struggling to stand, as I was still blind and disoriented from the mace . . . . [M]y hands were bleeding from my handcuffs being so tight.  My inability to follow these commands led to further physical beatings.

. . . .

34.  I suffered considerable pain and suffering due to the treatment I received, both from the arresting officers and the officers at the jail.  I received medical treatment and physical therapy for a bulging disk and pinched nerves in my neck and spine.  I have also been treated for PTSD . . . . I sustained considerable injuries of both a physical and psychological nature, many of which are continuing in nature.

Pl.'s Response ¶ 18.  As for the County defendants' factual assertion that plaintiff was physically noncompliant with commands and directions during this decontamination shower, plaintiff denies it with a citation to the same block response reproduced above.  *Id.* ¶ 19.

The problem with this response is that it is not actually responsive.  It does not amount to an admission or a denial of an important assertion of

fact: whether or not LaFever "continued to be both physically and verbally noncompliant."  County Facts ¶ 19.  Instead, plaintiff's response seeks to add additional facts about the events inside the County Jail.

But additional facts do not belong in this part of the response to a movant's statement of material facts.  Local Rule 7.1(a)(3) instructs the non-movant to include these "additional material facts" separately from the admissions or denials that make up a non-movant's response to the movant's statement of facts.

In other words, the correct way for LaFever to have gone about this would have been to admit or deny the movant's facts about their version of events and then add additional facts about her own version of events in a separate response.  Plaintiff's improper approach to this simple procedural requirement again results in an unnecessary degree of confusion.

LaFever's additional facts include a claim that the County Officers "slammed" her body against the walls while she was handcuffed in the shower area.  Pl.'s Response to County Facts ¶ 18.  If true, that might tend to support a conclusion that the officers' use of force was objectively unreasonable under the circumstances.

However, the County defendants have asserted that LaFever continued to be "physically and verbally noncompliant" at this time.  County Facts ¶ 19. For instance, County Officer Rotundo avers that plaintiff "continued to be

noncompliant in the shower area, so she was placed against the wall while I held her right arm against the wall and [County Officer] Shopa held her left arm against the wall. Rotundo Aff., Dkt. No. 80-5 ¶ 14. If these facts are *also* true, then an active struggle with a noncompliant detainee that results in the detainee being "slammed" against the wall of the shower area might not be an unreasonable use of force under *Kingsley*.

As before, LaFever was a direct participant in these events. She is in the best position to know whether or not she physically resisted the County Officers and/or verbally resisted their commands. She is competent to admit or deny those assertions. She has not done so. And the declaration she cites in response does not include details about the incident that would be sufficient to infer that she meant her explanation as a denial. *See generally* LaFever County Decl. Accordingly, paragraphs eighteen and nineteen of the County defendants' Statement of Material Facts will be deemed admitted for the purpose of assessing the County defendants' motion for summary judgment.

### 3. **LaFever's Declarations**

LaFever has submitted declarations in opposition to the City defendants' and the County defendants' motions for summary judgment. LaFever City Decl., Dkt. No. 89-1; LaFever County Decl., 90-1. These declarations offer additional facts about plaintiff's encounters with law enforcement, first at the

hotel and then later at the County Jail.  These additional facts will be considered to the extent they do not specifically controvert the admitted facts discussed *supra* in IV.A.1–2.

### 4.  **The Video Evidence**

Finally, the parties have conventionally filed three different pieces of video evidence.  LaFever has submitted the Jail Intake Video, which depicts the events that occurred in the receiving area of the County Jail.  Ex. 2 to Pl.'s Mot. for Summ. J., Dkt. No. 71-6.  The City defendants have submitted the Police Station Booking Video, which depicts the events that happened while plaintiff was being processed at the police station.  Ex. A to Jelinek Decl., Dkt. No. 79-1.

These two videos have already been discussed at some length and will be considered in evaluating the summary judgment motions.  However, there is a third video that has not yet been mentioned: a video recording that LaFever herself created at some point after she was released from the County Jail.  Ex. B to Jelinek Decl., Dkt. No. 79-4 ("Recorded Call Video").  This video, which is over fifteen minutes in length, is entitled "Confronting Kathy from Howard Johnson's."  Apparently intended for public dissemination on social media, the video depicts plaintiff looking into the camera as she initiates a telephone call with Babcock, the hotel manager.

As the City defendants try to explain:

> In such video, Plaintiff <u>admits</u> that she made physical contact with Officer Clarke (at multiple points during the parties' telephone conversation) prior to being placed under arrest, that she had refused to leave the hotel room, and that she was being uncooperative when Officers Clarke and Sheehan attempted to obtain relevant information and get Plaintiff's version of the facts.

City Defs.' Mem., Dkt. No. 79-14 at 15 (emphasis in original).

For some reason, LaFever seems to believe this video is helpful to her own arguments. She has actually attached a transcription of this recorded call as an exhibit to her opposition to the City defendants' motion for summary judgment. Ex. A to Pl.'s City Opp'n, Dkt. No. 89-3.

The Court has reviewed this video. It does not help LaFever's case. If anything, some of the statements made by plaintiff in this recording support the officers' version of events at the hotel. *See, e.g.*, Recorded Call Video at 4:57–5:02 ("It doesn't matter that I touched [the officer's] chest, I asked him to leave, he deserved to."); *id*. at 5:57–6:00 ("When I touched the police officer, I asked him to get out of my way."); *id*. at 12:59–13:03 ("I pushed my finger at him. I said you have to get out, you have to leave. And I thought he should have left. I don't think he should have been there.").[12]

Even so, this video is not useful at summary judgment. Unlike the Police Station Booking Video and the Jail Intake Video, this third recording does

---

[12] There are no hardcoded timestamps on this video, so citations are to the media file itself.

not offer a real-time window into the events as they unfolded at the hotel. It was not made under oath. And this is so regardless of whether plaintiff believed otherwise. *See* Recorded Call Video at 12:46–12:51 ("She's under oath. We are under oath to each other. That's why I called live. I have to tell the truth, too.").

Instead, this video is merely LaFever's *post hoc* recollection of some of the events that occurred at the hotel. She just happened to record it and publish it to the world. While it might have somehow proved useful as impeachment evidence at a trial, it cannot establish the presence or absence of any genuine disputes over any of the material facts. Accordingly, the Recorded Call Video will not be considered at summary judgment.

## B. The Merits

### 1. The City Defendants

LaFever's second amended complaint asserted § 1983 claims against City Officer Clarke and City Officer Sheehan for false arrest and imprisonment (Second Cause of Action), unreasonable search and seizure (Third Cause of Action), and excessive force (Fifth Cause of Action). The second amended complaint also asserted § 1983 claims against the City and Chief Marsh.

LaFever has since stipulated to the discontinuance of her § 1983 claim against the City and agreed to the dismissal of any claims she may have had

against Chief Marsh.[13]  Dkt. Nos. 87, 88.  And a review of her opposition to the City defendants' motion reveals that she has abandoned several others as well.

The preliminary statement in LaFever's opposition memorandum contends that plaintiff has sued the City defendants for a whole host of different constitutional deprivations.  But plaintiff only offers arguments in opposition to the dismissal of her false arrest and excessive force claims.  *Compare* Pl.'s City Opp'n, Dkt. No. 89 at 3–8 (accusing defendants of violating her rights to, *inter alia*, "privacy, security, [and] bodily integrity"), *and id.* at 19–21 (articulating an Eighth Amendment standard "as alternative support"), *with id.* at 13–30 (explaining why her Fourth Amendment false arrest and excessive force claims should not be dismissed).

In their reply brief, the City defendants argue that LaFever has abandoned all of these undefended claims.  City Defs.' Reply, Dkt. No. 98-2 at 9–11.  Upon review, the City defendants are correct.  "Federal courts may deem a claim abandoned when a party moves for summary judgment on one

---

[13]  Chief Marsh was not a necessary defendant for purposes of a § 1983 municipal liability claim against the City.  *See, e.g.*, *Benacquista v. Spratt*, 217 F. Supp. 3d 588, 599 n.4 (N.D.N.Y. 2016) (explaining that supervisory liability and municipal liability are distinct concepts).  And he was not a direct participant in any of the alleged events.  Proving his liability would have been all but impossible.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (clarifying the "personal involvement" requirement that applies in the context of a § 1983 supervisory liability claim).

ground and the party opposing summary judgment fails to address the

argument in any way." *Frantti*, 414 F. Supp. 3d at 291 (citation omitted).

As the Second Circuit has explained:

> Generally, but perhaps not always, a partial response
> [to a motion for summary judgment] reflects a decision
> by a party's attorney to pursue some claims or
> defenses and to abandon others.  Pleadings often are
> designed to include all possible claims or defenses, and
> parties are always free to abandon some of them.
> Moreover, preparation of a response to a motion for
> summary judgment is a particularly appropriate time
> for a non-movant party to decide whether to pursue or
> abandon some claims or defenses.  Indeed, Rule 56 is
> known as a highly useful method for narrowing the
> issues for trial.

*Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).

With the exception of her false arrest and excessive force claims, the Court

concludes that LaFever has abandoned all of her other claims against the

City defendants because she has not mounted a defense against the facially

valid arguments for dismissal that were advanced by those defendants in

their opening brief.  *See, e.g.*, *Kovaco v. Rockbestos-Surprenant Cable Co.*, 834

F.3d 128, 143 (2d Cir. 2016) (instructing lower courts to make a specific

finding of abandonment where appropriate).  Accordingly, those claims will

be dismissed as abandoned.

### i. **False Arrest**

A § 1983 false arrest claim is grounded in the Fourth Amendment right of an individual to be free from unreasonable seizures.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  "To establish a claim under § 1983 for false arrest a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged."  *Jackson v. City of N.Y.*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (citation omitted).

As an initial matter, the City defendants contend that LaFever's § 1983 false arrest claim is barred by her guilty plea to the harassment charge.  City Defs.' Reply at 11–13.  In support of this argument, defendants have submitted a "certificate of conviction/disposition" from Norwich City Court.  Ex. H to Jelinek Decl., Dkt. No. 79-10.  This certificate establishes that plaintiff pleaded guilty to the "physical contact" prong of New York's harassment statute.  *Id.* (citing N.Y. PENAL LAW 240.26(1)).

"Where the plaintiff has been convicted of at least one offense for which he was arrested, the conviction will generally foreclose a false arrest claim by serving as conclusive evidence of probable cause to arrest."  *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 596 (W.D.N.Y. 2019) (cleaned up).  This rule applies regardless of whether the conviction was after a trial or simply the

result of a plea. *Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 428 (S.D.N.Y. 2012) (collecting cases).

Notably, certain kinds of conditional dismissals might not have preclusive effect on a § 1983 false arrest claim.  For example, several courts have held that an adjournment in contemplation of dismissal ("ACD") does not bar a later false arrest claim because it does not necessarily indicate the arrestee was guilty of the charge. *Case v. City of N.Y.*, 233 F. Supp. 3d 372, 383 (S.D.N.Y. 2017) ("Unlike a conviction, an ACD leaves open the question of guilt . . . ."); *see also Ivery v. Baldauf*, 284 F. Supp. 3d 426, 436 (W.D.N.Y. 2018) ("The fact that plaintiff eventually received an ACD does not bar his false-arrest claim.").

Upon review, however, LaFever's guilty plea bars her § 1983 false arrest claim against the City defendants.  Plaintiff received a conditional dismissal following her plea.  City Facts ¶ 111.  Importantly, though, there is no indication that this matter was resolved by an ACD, which is essentially an adjournment of the charge.  Instead, the certificate of conviction/disposition indicates that plaintiff "pled guilty" to the offense.  Ex. H to Jelinek Decl., Dkt. No. 79-10.  Accordingly, plaintiff's § 1983 false arrest claims against the City defendants must be dismissed. *Phelan v. Sullivan*, 541 F. App'x 21, 23 (2d Cir. 2013) (summary order) ("A false arrest claim is defeated by the plaintiff's conviction for the arrest for which he was arrested.").

Even assuming otherwise, LaFever's § 1983 false arrest claims would still fail because the admitted facts establish the existence of probable cause. "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Hulett*, 253 F. Supp. 3d at 494 (quoting *Simpson v. City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015)).

"A police officer has probable cause to arrest when he has knowledge of reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Hulett*, 253 F. Supp. 3d at 494 (cleaned up). "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Id.* (quoting *Yorzinski v. City of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016)).

The City defendants assert that City Officers Clarke and Sheehan had probable cause to arrest LaFever for (1) second-degree harassment and/or (2) criminal trespass. City Defs.' Mem. at 30. They are correct on both counts.

A person is guilty of criminal trespass when she "knowingly enters or remains unlawfully in or upon premises." N.Y. PENAL LAW § 140.05. The admitted facts establish that City Officers Clarke and Sheehan received

information from Babcock, the hotel manager, that indicated plaintiff refused to vacate her room after her stay had expired.  City Facts ¶ 11.  The facts further establish that plaintiff ignored the officers' orders to vacate the room.  *Id.* ¶ 27.

In fact, LaFever herself acknowledges that she had overstayed her period of lawful occupancy and gotten into a "heated debate" with hotel staff over whether she had to leave.  Pl.'s Opp'n to City Defs., Dkt. No. 89 at 26 ("The incident occurred less than 15 minutes after checkout time. . . ."); *see also* Ex. D to Jelinek Decl., Dkt. No. 79-6 ("LaFever City Dep.") at 67:1–68:5 (testifying that hotel staff told her "you have to leave" and "you can't stay").

The officers were entitled to rely on their own observations as well as information they received from Babcock in assessing whether there was probable cause to believe LaFever was trespassing.  *See, e.g.*, *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[W]e have found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee.").

There was also probable cause to believe LaFever was guilty of second-degree harassment.  A person is guilty of second-degree harassment when, "with intent to harass, annoy or alarm another person" she "strikes, shoves kicks or otherwise subjects such person to physical contact, or attempts or threatens to do the same."  N.Y. PENAL LAW ¶ 240.26(1).

The admitted facts establish that LaFever spoke in a raised voice to Babcock and to the officers and then made physical contact with City Officer Clarke on more than one occasion.  City Facts ¶¶ 32–37.  Plaintiff also admits that she made some kind of physical contact with the officer.  LaFever City Dep. at 75:6–75:14; *see also* LaFever City Decl., Dkt. No. 89-1 ¶ 20 ("There was only one contact initiated by me, and it was not threatening, harmful or aggressive.").

In short, the officers had probable cause to arrest LaFever for criminal trespass or second-degree harassment.  *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018) ("Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking.").  Because probable cause is a complete defense to a false arrest claim, plaintiff's § 1983 false arrest claims against Officers Clarke and Sheehan must be dismissed.

### ii.  **Excessive Force**

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest."  *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).  To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying

intent or motivation." *Id.* (cleaned up). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Id.*

This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy*, 634 F.3d at 96).

Thus, review of an excessive force claim is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

"Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up). "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* "Accordingly, police receive a fairly wide zone of

protection in close cases involving potential danger, emergency conditions, or other exigent circumstances." *Id.*

As an initial matter, the Court has deemed admitted the City defendants' Statement of Material Facts because LaFever failed to file a proper responsive submission. These admitted facts establish that plaintiff acted aggressively during the police encounter and physically resisted the officers' attempts to arrest her. City Facts ¶¶ 17–38. Plaintiff's resistance included punching and kicking City Officer Clarke, thrashing her body around, and flailing her arms and legs. *Id.* ¶¶ 42–47. She screamed obscenities and made threatening statements to both officers. *Id.* ¶¶ 55–57. Plaintiff continued to resist even after she was handcuffed. *Id.* ¶ 59–62.

In opposition to summary judgment on this claim, LaFever asserts in a declaration that the two officers tackled her, rolled her on the floor, threw her against the walls, and then dragged her out of the room. LaFever City Decl., Dkt. No. 89-1 ¶¶ 23, 25–27. Plaintiff asserts she was eventually "shoved" into the patrol car, but not until after her "face was smashed against the window." *Id.* ¶ 30. Plaintiff denies resisting at all. *See, e.g.*, *id.* ¶¶ 25, 27.

This account suggests LaFever would have suffered significant physical injury. Indeed, plaintiff asserts that she suffered "a bulging disk and pinched nerves" in her "neck and spine," and was "treated for PTSD." LaFever City Decl. ¶ 35. But plaintiff acknowledges that she did not seek any conventional

medical treatment for these injuries.  *Id.* ¶ 34.  Instead, plaintiff explains, she

is a "Chinese medical practitioner" and "sought [her] own eastern Buddhists

[*sic*] methods of treatment immediately, and for a year, until [she] had to get

western medical help."  *Id.*

LaFever has not offered any of these later, "western" medical records to

support her claims of injury in opposition to the City defendants' motion for

summary judgment.  *See generally* Dkt. No. 89.  However, plaintiff has

provided some photographs of her alleged injuries.[14]  These photographs

show swelling and irritation around her eyes.  They also show a bump on her

head and some bruising and swelling on her wrists, biceps, and fingers.

Of course, evidence about the nature and extent of a plaintiff's injuries are

not dispositive of an excessive force claim.  *Rolkiewicz v. City of N.Y.*, 442 F.

Supp. 3d 627, 645 (S.D.N.Y. 2020).  Indeed, "the relevant legal analysis

depends not on a particular quantum of injury but on a showing of the

objective reasonableness of the conduct."  *Moore v. Keller*, –F. Supp. 3d–, 2020

WL 6384691, at *16 (explaining that evidence of "lasting or serious injury" is

not the *sine qua non* of an excessive force claim).  However, evidence of a

---

[14]  These photographs are labeled "injuries sustained 11-30-2015 by Norwich, New York Law Enforcement Officers."  However, plaintiff only included them as an exhibit to her opposition to the County defendants' separate motion for summary judgment.  Ex. G to Pl.'s County Opp'n, Dkt. No. 90-12.  Plaintiff has since submitted a "supplemental declaration" against "all defendants" that references these photographs.  Dkt. No. 90-3.  Accordingly, the Court will examine them in connection with the City defendants' motion as well.

plaintiff's injury is still relevant, "because it is probative of the amount and type of force actually used by the arresting officers[.]" *Rolkiewicz*, 444 F. Supp. 3d at 645 (citation omitted).

Upon review, these photographs are of limited use on summary judgment because they raise more questions than they answer. How much, if any, of these injuries are traceable to the hotel incident with City Officers Clarke and Sheehan? How much, if any, of the bruising on plaintiff's wrists is attributable to her own conduct in slipping out of her handcuffs in the police station booking area? As for the eye irritation and swelling, everyone agrees that plaintiff was sprayed with a "chemical agent" (*e.g.*, mace or pepper spray) by the County Officers. Those injuries would not be traceable to the City defendants.[15]

Nor do these photographs definitively contradict any party's version of events. Many of these injuries would be consistent with handcuffing and resisting arrest. However, many of these injuries would also be consistent with being pepper sprayed and resisting at the County Jail. And viewed in the light most favorable to her, these injuries could also be consistent with the story told in LaFever's declaration.

---

[15] The Police Station Booking Video recorded shortly after plaintiff's arrest at the hotel shows her performing handstands, a split, and yoga moves. *See generally* Booking Video. The video is not exactly high quality, but there is no indication of any serious wrist injuries or eye irritation at that time.

With all this in mind, the Court concludes that no reasonable jury could find in LaFever's favor on this excessive force claim.  To be sure, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit."  *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (emphasis in original).  And as the Second Circuit has recently reiterated, clearly established law makes it "impermissible to use significant force against a restrained arrestee who is not actively resisting."  *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020).

The problem here is that the admitted facts establish that LaFever acted aggressively during the *entirety* of the police encounter and continuously physically resisted the officers' attempts to arrest her.  City Facts ¶¶ 17–38.  This resistance included punching and kicking City Officer Clarke, thrashing her body around, and flailing her arms and legs.  *Id.* ¶¶ 42–47.  Plaintiff continued to resist even after she was handcuffed.  *Id.* ¶ 59–62.

As discussed *supra*, LaFever in her declaration claims that the two officers tackled her, rolled her on the floor, threw her against the walls, and then dragged her out of the room.[16]  LaFever City Decl. ¶¶ 23, 25–27.  But even assuming these additional facts as true and drawing all permissible favorable

---

[16] As noted, plaintiff denies resisting at all.  LaFever City Decl. ¶¶ 25, 27.  But the fact of her continuous, significant physical resistance (*e.g.*, punching and kicking, thrashing her body around, and flailing her arms and legs) has been admitted for purposes of summary judgment.

inferences from them, the other admitted facts would still prevent a jury from concluding that plaintiff was subjected to "significant force" at a time that she was no longer "actively resisting." *Cf. Lennox*, 968 F.3d at 157 (affirming denial of qualified immunity on excessive force claim where a "reasonable jury could find that the force used by Officer Clarke was significant and that [the plaintiff] was not resisting when such force was used"). Accordingly, plaintiff's § 1983 excessive force claims against the City defendants will be dismissed.

## 2. **The County Defendants**

LaFever's second amended complaint asserted § 1983 claims against County Officers Hackett, Rotundo, White, Shopa, and the remaining Doe for false arrest and imprisonment (Second Cause of Action), excessive force (Fourth Cause of Action), and a violation of her right to due process and equal protection (Seventh Cause of Action). The second amended complaint also asserted a § 1983 claim against the County (Eighth Cause of Action).

However, LaFever has abandoned several of these claims. *See, e.g.*, *Frantti*, 414 F. Supp. 3d at 291. In particular, plaintiff has failed to offer a defense of her false arrest or equal protection claims. *See, e.g.*, *Kovaco*, 834 F.3d at 143. Accordingly, those claims will be dismissed against the County defendants.

### i.  Remaining Claims

This leaves for consideration LaFever's (a) excessive force claim arising from her transfer into the custody of the County Jail, which is captured on the Jail Intake Video; (b) excessive force claim arising from the decontamination shower that followed; (c) unlawful strip search claim; and (d) municipal liability claim against the County and Sheriff Cutting.

### a.  The Jail Intake Video

LaFever's first excessive force claim is based on the County Officers' allegedly unreasonable use of force in removing her from the police cruiser, spraying her with mace or pepper spray, and taking her inside the County Jail.  As discussed *supra*, this incident is captured on the Jail Intake Video without any accompanying audio.

"The right not to be subject to excessive force, perhaps most commonly associated with the Fourth and Eighth Amendments, can also arise under the Fourteenth." *Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018).  As relevant here, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 251–52 (2d Cir. 2020) (quoting *Graham*, 490 U.S. at 395 n.10).

Of course, "[a]n officer's actions can amount to punishment if they are taken with 'an expressed intent to punish.'" *Frost*, 980 F.3d at 252 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).  "But even 'in the absence of an

expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 389).

In *Kingsley*, the Supreme Court held that a pretrial detainee's excessive force claim must be measured by an "objective reasonableness" standard that "turns on the facts and circumstances of each particular case." 576 U.S. at 397. In other words, the standard used to evaluate an excessive force claim brought by a pretrial detainee under the Due Process Clause of the Fourteenth Amendment is broadly similar to the standard applied in the context of an excessive force claim brought by an arrestee under the Fourth Amendment.

Even so, the distinction is a relevant one. "[M]any Fourth Amendment decisions relating to the use of force during an arrest turn on factors that have little relevance in the context of force used against a person who has already been taken into custody, such as the severity of the crime that led to the arrest, the risk of the suspect's flight to avoid arrest, and the danger that the suspect posed to members of the public." *Casiano v. Ashley*, –F. Supp. 3d–, 2021 WL 281460, at *3 (W.D.N.Y. Jan. 28, 2021) (citation omitted).

As the Second Circuit has explained:

> This standard should be applied "from the perspective and with the knowledge of the defendant officer," and should account for factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate."

*Frost*, 980 F.3d at 252.

Upon review, no reasonable jury could find in LaFever's favor on this excessive force claim. As explained *supra*, the Court has deemed admitted paragraph nine of the County's Statement of Material Facts, which establishes that the County Officers were put on notice by Norwich PD that plaintiff was being uncooperative and was in possession of an unknown object. County Facts ¶ 9. The Court has also deemed admitted paragraphs twelve through sixteen, which establishes that plaintiff refused the officers' verbal commands to drop the object in her hands. *Id.* ¶¶ 12–16. Once plaintiff complied, the use of physical force abated. *See id.* ¶¶ 12–16.

Importantly, the County defendants have offered a "legitimate nonpunitive governmental purpose" behind this forceful approach. According to them, contraband items possessed by a person entering the County Jail

pose a danger to the health and safety of the inmates, officers, and staff.  County Facts ¶ 10.

LaFever denies this assertion because, in her view, the object was not a sufficient concern to the Norwich PD officers.  Pl.'s Response to County Facts ¶ 10; *see also* Pl.'s Opp'n, Dkt. No. 90 at 12 (explaining that the City defendants "did not think it posed enough of a danger that they attempted to force it from her when she was handcuffed for transportation to the jail").

However, this response does not appropriately controvert the County defendants' assertion of fact.  Even if it did, the County Jail is not the Norwich police station.  It is a separate facility with different security needs.  As the Supreme Court recognized in *Kingsley*, courts considering an excessive force claim brought by a pretrial detainee must be sure to account for the legitimate interests in institutional security that arise in the prison context.  576 U.S. at 397.

The Court has also independently reviewed the Jail Intake Video.  It does not support LaFever's version of events.  *See, e.g.*, *Berman v. Williams*, 2019 WL 4450810, at *6 (S.D.N.Y. Sept. 17, 2019) ("The defendants' use of force during the Intake Search Area incident was objectively reasonable because it was proportionate to the plaintiff's resistance.  The plaintiff refused to comply with orders to remove his clothing in the Intake Search Area, which was a legitimate command.").

There is no indication in the Jail Intake Video that the County Officers' use of force was gratuitous (*e.g.*, no indication of any kicks, punches, etc.). *Kingsley*, 576 U.S. at 397 (directing courts to consider "whether the plaintiff was actively resisting"). There is no indication that the degree of force used was not reasonably related to the County Officers' attempt to get plaintiff to drop the object. *Id.* (directing courts to assess the relationship "between the need for the use of force and the amount of force used"). There is no indication that the use of force continued after plaintiff complied. *Id.* (directing courts to consider whether there was "any effort made by the officer to temper or limit the amount of force used"). And there is little evidence to support any claim of serious or lasting injury. *Id.* (directing courts to consider "the extent of the plaintiff's injury").

As with her opposition to the City defendants' motion, LaFever claims she "suffered considerable pain and suffering" and needed "physical therapy for a bulging disk and pinched nerves" in her neck and spine." LaFever County Decl. ¶ 34. Once again, though, plaintiff has not submitted any medical evidence in support of these assertions. *See generally* Dkt. No. 90.

This leaves for consideration the photographs of her alleged injuries. Ex. G to Pl.'s County Opp'n, Dkt. No. 90-12. As before, it is unclear to what extent, if any, plaintiff has asserted that she received these injuries from the

County Officers rather than the City defendants.  However, the eye swelling and irritation would be consistent with being pepper sprayed or maced.

When measured against the various factors outlined by the Supreme Court in *Kingsley*, a review of the Jail Intake Video in light of the admitted facts confirms that no reasonable jury could find in LaFever's favor on an excessive force claim against the County Officers.  *Casiano*, 2021 WL 281460, at *4 (granting summary judgment on excessive force claim where pre-trial detainee resisted, was taken to the ground, and given a short burst of pepper spray with no lasting injuries).

In the alternative, qualified immunity would defeat this claim.  "Second Circuit precedent clearly disallows the gratuitous use of pepper spray against restrained individuals.  However, there is no clearly established law forbidding its use against individuals who refuse to comply with officer instructions after a warning."  *Taylor v. Nieves*, 2020 WL 7028907, at *3 (S.D.N.Y. Nov. 30, 2020) (internal citation omitted).

As discussed *supra*, LaFever has left uncontested the County defendants' factual assertion that they did not use the "chemical agent" until after she refused multiple verbal commands to drop the object in her hands.  A review of the Jail Intake Video does not undermine this assertion.  Accordingly, this excessive force claim against the County Officers will be dismissed.

## b. __The Decontamination Shower__

Broadly construed, LaFever has asserted a separately cognizable claim for excessive force based on the County Officers' allegedly unreasonable use of force in the decontamination shower.  Unlike the incident in the receiving area outside the Jail, these events are not captured on video.  The entirety of plaintiff's argument on this point is as follows:

> There was a total lack of explanation of anything that was happening until Plaintiff had been pushed, shoved, and thrown around for a substantial period of time without any attempt to obtain compliance, and without any attempt to use anything but brute force. Defendant [*sic*] describes the shower as freezing, and her treatment as being subject to verbal and physical abuse.  She was shoved against the shower walls and down on the shower floor, at least part of the time while restrained in handcuffs.

Pl.'s Opp'n, Dkt. No. 90 at 24.

As discussed *supra*, LaFever has introduced some additional relevant facts through a declaration she filed in opposition to the County defendants' motion for summary judgment:

> 30.  Once inside the jail, two female officers further abused me by stripping my clothes off and forcing me to take a freezing cold shower.  Since the court ordered me to be released upon posting bail in the amount of $500, none of these actions were reasonable.

> 31.  Officers slammed my body against the shower walls several times and down on the shower floor while I remained in handcuffs.

> 32.  Officers verbally abused me by screaming various
> commands at me like where to stand and how to use
> the shampoo.  I was on my hands and knees struggling
> to stand, as I was still blind and disoriented from the
> mace . . . . [M]y hands were bleeding from my
> handcuffs being so tight.  My inability to follow these
> commands led to further physical beatings.

Pl.'s Response ¶ 18; *see also* LaFever County Decl., Dkt. No. 90-1 ¶¶ 30–32.

Upon review, this claim will also be dismissed.  "Excessive force claims frequently involve factual disputes that make them difficult to resolve pursuant to summary judgment."  *Savage v. Acquino*, 2018 WL 1478254, at *7 (W.D.N.Y. Mar. 23, 2018).  However, plaintiff has failed to controvert that she was being "physically and verbally noncompliant" during the events in the shower area.  County Facts ¶ 19.  Taking LaFever's additional facts about the encounter as true, the summary judgment analysis amounts to assessing whether a reasonable jury could conclude that the County Officers' conduct during an active struggle with a noncompliant detainee was unreasonable in light of the *Kingsley* factors.

As with the Jail Intake Video, there is no indication in the record that the County Officers' use of force in the shower was gratuitous (*e.g.*, no allegations of any kicks, punches, etc.).  *Kingsley*, 576 U.S. at 397 (directing courts to consider "whether the plaintiff was actively resisting").  There is no indication that the degree of force was not reasonably related to an attempt to gain compliance.  *Id.* (directing courts to assess the relationship "between

the need for the use of force and the amount of force used").  There is no indication that the use of force continued after LaFever complied.  *Id*. (directing courts to consider whether there was "any effort made by the officer to temper or limit the amount of force used").  And there is little evidence to support any claim of serious or lasting injury.  *Id*. (directing courts to consider "the extent of the plaintiff's injury").

To be sure, LaFever's declaration claims she was slammed into the shower walls and that her inability to follow the County Officers' commands "led to further physical beatings."  LaFever County Decl. ¶¶ 30–32.  But plaintiff does not even try to explain what she means by this kind of generalized, non-specific accusation about more "beatings."  And she has offered little to no supporting evidence to back it up.

So the Court is left to ask: do the few, relatively ambiguous statements about the use of force made by plaintiff in her declaration along with the photographs of her alleged injuries create a material issue of fact for trial in light of the admission that she was physically resistant during this entire encounter?  The answer is no.  Even viewing the disputed facts in the light most favorable to plaintiff, the factors outlined in *Kingsley* make clear that no

reasonable jury could find in her favor on this § 1983 claim for excessive force.[17]  Accordingly, this claim will also be dismissed.

### c.  **The Strip Search**

LaFever argues that she was subjected to an "unlawful" strip search.  Pl.'s County Opp'n, Dkt. No. 90 at 21–24.  According to plaintiff, it was "administered as part of punishment for perceived disrespectful behavior towards a police officer."  *Id*. at 21.

"A 'strip search' is an inspection of a naked individual, without any scrutiny of the subject body's cavities."  *Jenkins v. City of N.Y.*, 2020 WL 6700087, at *2 n.4 (E.D.N.Y. Nov. 12, 2020) (cleaned up).  "A strip search is distinguishable from a 'visual body cavity search,' which extends to visual inspection of the anal and general areas, or a 'manual body cavity search,' which includes some degree of touching or probing of body cavities."  *Id.*

"Strip searches of pre-trial detainees (as well as inmates) are constitutionally valid if they are reasonably related to a legitimate penological interest."  *Perez v. Ponte*, 236 F. Supp. 3d 590, 622–23 (E.D.N.Y. 2017) (cleaned up).  "In determining the overall reasonableness of a strip search, courts must consider the scope of the particular intrusion, the

---

[17]  In the alternative, qualified immunity would attach to these facts.

manner in which it is conducted, the justification for initiating it, and the

place in which it is conducted." *Id*.

This claim will also be dismissed. As explained *supra*, the County Officers

have offered a legitimate penological interest for conducting the search; *i.e.*,

to determine whether LaFever possessed any other contraband. County

Facts ¶ 20. Female County Officers conducted the search in the shower area,

away from any other inmates or male officers. *Id*. And the search itself was

"visual only." *See id*. In short, plaintiff has not offered evidence from which a

reasonable jury could conclude that she was strip searched for the purpose of

intimidation, harassment, or punishment. *Pizarro v. Bd. of Corr.*, 2018 WL

3462512, at *5 (S.D.N.Y. July 17, 2018). Accordingly, this claim will be

dismissed.

### d. **Municipal Liability**

LaFever's second amended complaint seems to assert a § 1983 municipal

liability claim against the County based on the alleged existence of a *de facto*

policy of "summarily punish[ing]" people who resist arrest. *See* Second Am.

Compl. ¶¶ 113–15. However, plaintiff has not named the County as a

defendant. *See generally id*. Instead, plaintiff has sued Sheriff Cutting in his

individual capacity. *Id*. ¶ 6. According to plaintiff, the Sheriff "is liable for

the damages suffered by the Plaintiff as a result of the conduct of the

Defendants who are employed by the Sheriff's Office at the Chenango County Jail." Pl.'s County Opp'n at 25.

That sounds an awful lot like a *respondeat superior* claim against Sheriff Cutting. However, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618 (cleaned up). There is no evidence that Sheriff Cutting was personally involved in any of the alleged events. Accordingly, any § 1983 supervisory liability claim against Sheriff Cutting in his *individual* capacity will be dismissed.

To the extent that LaFever intended to sue Sheriff Cutting in his *official* capacity, the Supreme Court has explained that this kind of claim is "to be treated as a suit against the entity"; *i.e.*, the County itself. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). This appears to have been LaFever's intention all along, since she invoked *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See* Pl.'s County Opp'n at 25.

In *Monell*, the Supreme Court has held that a municipality may be held liable under § 1983 if a plaintiff can demonstrate that the constitutional violation was caused by a municipal "policy or custom." 436 U.S. at 694.

However, the Supreme Court has intentionally made these so-called "*Monell*" claims "hard to plead and hard to prove." *Crawley*, 2020 WL 6153610, at *9. "Unlike state tort law, a municipality cannot be held liable under § 1983 merely because it happened to employ the alleged tortfeasor." *Id.*

Instead, "under § 1983[ ] local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, "to establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that the deprivation of his constitutional right was 'caused by a governmental custom, policy or usage of the municipality.'" *Deferio v. City of Syracuse*, 770 F. App'x 587, 589 (2d Cir. 2019) (summary order) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

LaFever contends that the County and Sheriff Cutting may be held liable because these defendants failed to provide "adequate training or guidelines" to the County Officers about how to avoid constitutional violations when strip-searching pre-trial detainees. Pl's County Opp'n, Dkt. No. 90 at 24-25.

Upon review, LaFever's *Monell* claim must be dismissed. "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has

sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).

As discussed *supra*, LaFever has not established any viable § 1983 claims against any of the individual County Officers or against Sheriff Cutting in his individual capacity. *See, e.g.*, *Carter*, 394 F. Supp. 3d at 239–40 (explaining that the "presence of an underlying constitutional violation remains a 'required predicate'" to pursue a *Monell* claim). Because plaintiff has failed to establish any underlying constitutional violation, her *Monell* claim will also be dismissed.

### 3.  **The Remaining Doe**

As a final matter, the remaining Doe defendant must be dismissed from this action because LaFever failed to ascertain her identity by the close of discovery. *See, e.g.*, *Kenney v. Clay*, 172 F. Supp. 2d 3d 628, 642 (N.D.N.Y. 2016) (dismissing Doe defendants on same basis).

## V.  **CONCLUSION**

LaFever's claims will be dismissed because she has failed to controvert important facts about the events at the hotel and at the County Jail. And even viewing the additional facts offered by plaintiff in the light most favorable to her, they are too sparse and generalized to create a jury question on any of her claims. Finally, because the County defendants' motion will be

granted, plaintiff's partial motion for summary judgment will be denied.  *See*

*generally* Dkt. No. 71-4.

Therefore, it is

ORDERED that

1.  The City's motion for summary judgment is GRANTED;

2.  The County's motion for summary judgment is GRANTED;

3.  Plaintiff's motion for partial summary judgment is DENIED; and

4.  Plaintiff's second amended complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motions, enter

a judgment accordingly, and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  March 11, 2021
        Utica, New York.